IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| DIAMOND OFFSHORE COMPANY and DIAMOND OFFSHORE MANAGEMENT COMPANY | § § § | |
| *Plaintiffs,* | § § | |
| v. | § § | **10-2136** |
| KENNETH LEE "KEN" SALAZAR, IN HIS OFFICIAL CAPACITY AS SECRETARY, UNITED STATES DEPARTMENT OF THE INTERIOR; UNITED STATES DEPARTMENT OF THE INTERIOR; ROBERT "BOB" ABBEY, IN HIS OFFICIAL CAPACITY AS ACTING DIRECTOR, MINERALS MANAGEMENT SERVICE; AND MINERALS MANAGEMENT SERVICE, | § § § § § § § § § § § | Civil Action No. _____ |
| *Defendants.* | § | |

United States District Court
Southern District of Texas
FILED

JUN 1 7 2010

David J. Bradley, Clerk of Court

## PLAINTIFFS' ORIGINAL COMPLAINT AND APPLICATION FOR TEMPORARY RESTRAINING ORDER AND INJUNCTIVE RELIEF

Plaintiffs, Diamond Offshore Company and Diamond Offshore Management Company (collectively "Diamond," "Diamond Offshore," or "Plaintiffs"), file the following Complaint and Application for Temporary Restraining Order and Injunctive Relief in accordance with 28 U.S.C. § 2201 and Rules 57 and 65 of the Federal Rules of Civil Procedure against the named Defendants pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, for violations of the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1331 *et seq.*, and its implementing regulations.

## PARTIES

1.      Plaintiffs, Diamond Offshore, are Delaware companies with their principal place of business in Houston, Texas.  Diamond Offshore's principal business is to provide contract

offshore drilling services to the energy industry. Diamond Offshore operates a fleet of offshore drilling rigs world-wide, including in the Gulf of Mexico ("GOM").

2.      Defendant, Kenneth Lee "Ken" Salazar, is sued in his official capacity as the Secretary of the United States Department of the Interior ("Secretary Salazar").  As Secretary, pursuant to OCSLA, Mr. Salazar is the federal official ultimately responsible for the management and oversight of the leasing, exploration, and production of oil and gas on the Outer Continental Shelf ("OCS") and for all official actions or inactions of the Department of the Interior and Minerals Management Service challenged in this Complaint.

3.      Defendant, United States Department of the Interior ("DOI"), is a department of the United States Government with supervisory and management responsibility over the Minerals Management Service that, pursuant to OCSLA, has responsibility for implementation and application of the federal laws, regulations, and policies at issue in this Complaint.

4.      Defendant, Robert "Bob" Abbey, is sued in his official capacity as the acting Director of the Minerals Management Service.  Pursuant to OCSLA and authority delegated by the Secretary, Mr. Abbey is the federal official responsible for the proper administration of leasing, exploration, and production of oil and gas on the OCS.

5.      Defendant, Minerals Management Service ("MMS"), is an agent of the United States Department of the Interior that, pursuant to OCSLA and authority delegated by the Secretary, has the responsibility for managing the administration of leasing, exploration, and production of oil and gas on the OCS.  (Secretary Salazar, DOI, Mr. Abbey and MMS are collectively referred to herein as "Defendants").

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction pursuant to 43 U.S.C. § 1349(a), as Diamond has valid legal interests which are or may be adversely affected by a violation of 43 U.S.C. § 1331, *et seq.* or regulations promulgated under it.  Jurisdiction also exists by virtue of the APA, 5 U.S.C. §§ 701-706, and under 43 U.S.C. § 1349(b)(1), 28 U.S.C. § 2201 (declaratory relief) and 28 U.S.C. § 2202 (injunctive relief).

7.      Venue is proper in this District pursuant to 43 U.S.C. § 1349(b)(2) and 28 U.S.C. § 1391(e).

8.      Plaintiffs have complied with 43 U.S.C. § 1349(a)(3) by providing notification of the alleged violations to the appropriate persons, including the Secretary, prior to filing suit.

## GENERAL ALLEGATIONS

### A.      INTRODUCTION

9.      Diamond Offshore is a Houston-based company and is America's largest offshore drilling contractor.  Diamond Offshore employs approximately 5,000 individuals, many of whom reside in the states of Texas, Mississippi, Alabama, and Louisiana, and owns the 2nd largest fleet of floating drilling rigs in the world.  These rigs perform offshore oil and gas drilling and exploration activities all over the world, including the GOM OCS.  Since 2000, Diamond Offshore is responsible for over one-third of all wells safely-drilled from floating rigs in the GOM.  This translates to over 650 wells drilled in the GOM by Diamond Offshore floating rigs in the past ten years, with no significant well-control problems.

10.     Diamond Offshore enters long-term contracts with exploration and production companies. The cost of one of Plaintiffs' floating rigs can exceed $500,000 per day.  Since the imposition of the Moratorium and NTL-4, defined below, certain customers have instructed

Diamond Offshore to stop drilling.  Some of these customers have publicly indicated that the Moratorium constitutes a Force Majeure event, potentially impacting Plaintiffs' contract rights and creating a risk of further adverse consequences.

**B.    IMPOSITION OF THE MORATORIUM IS ARBITRARY AND CAPRICIOUS**

11.    On April 20, 2010, an explosion and fire on the drilling rig *Deepwater Horizon* resulted in an offshore oil spill (the "Incident").  On April 30, 2010, President Obama directed Secretary Salazar to conduct a review of the Incident and to report within 30 days on "what, if any, additional precautions and technologies should be required to improve the safety of oil and gas exploration and production operations on the outer continental shelf."

12.    On May 27, 2010, Secretary Salazar issued a Report entitled "Increased Safety Measures for Energy Development on the Outer Continental Shelf" (the "Report"), as requested by the President. (Ex. 1).  On May 28, 2010, Secretary Salazar issued a Memorandum entitled "Suspension of Outer Continental Shelf (OCS) Drilling of New Deepwater Wells" (the "Moratorium") (Ex. 2), imposing a six-month Moratorium on deepwater drilling on the OCS. In response, the MMS issued a document entitled NTL No. 2010-N04, a "Notice to Lessees and Operators of Federal Oil and Gas Leases in the Outer Continental Shelf regions of the Gulf of Mexico and the Pacific to Implement the Directive to Impose a Moratorium on All Drilling of Deepwater Wells" ("NTL-4"), effective May 30, 2010 (Ex. 3), which implemented the Moratorium. The Moratorium and NTL-4 are arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the APA, OCSLA, and its implementing regulations.

**(1)    Code of Federal Regulations**

13.    According to the Moratorium and NTL-4, the findings and recommendations in the Report provided the basis for Secretary Salazar's decision to issue the Moratorium

suspending deepwater drilling. *See* Exs. 2 and 3. The Moratorium and NTL-4 rely exclusively on 30 C.F.R. § 250.172(b) & (c) as the regulatory bases for the 6-month suspension and cessation of all GOM drilling in water depths greater than 500 feet, including for the 33 currently permitted wells. Neither the Report nor 30 C.F.R. 250.172, however, provide Defendants the authority to issue the Moratorium.

14.    Further, under its "Authority" section, NTL-4 references 30 C.F.R. § 250.172(b), which states that "the Regional Supervisor may grant or direct a suspension when activities pose a threat of serious, irreparable, immediate harm or damage" and § 250.172(c), which states that "the Regional Supervisor may grant or direct a suspension when necessary for the installation of safety or environmental protection equipment." Ex. 3. But there is nothing in the Authority section – or anywhere else in NTL-4 – that explains why **all** OCS drilling operations in more than 500 feet of water pose any greater threat on May 30, 2010, the date NTL-4 was issued, than existed on April 19, 2010, the day before the Incident. Nor does the Moratorium discuss or refer to any safety or environmental equipment that should be installed. In fact, as noted, 29 of the 33 permitted drill sites affected by the Moratorium and NTL-4 were inspected by the MMS *after the Incident of April 20, 2010*, and no violations were found on 27 of the 29 rigs inspected, much less any "threat of serious, irreparable, immediate harm or damage" or any need for additional "safety or environmental equipment" identified for any rig. *See* Ex. 4. Further, 30 C.F.R. 250.170 requires that the length of any suspension **"will be based on the individual case involved."** (emphasis added). It therefore follows that a "blanket" Moratorium, rather than one based upon the individual rigs subject to the Moratorium, is clear evidence of an arbitrary and capricious decision that constitutes an abuse of discretion and is not in accordance with APA, OCSLA, or their implementing regulations.

### (2)    The Administrative Procedures Act

15.    The APA[1] requires that Defendants' Moratorium contain an appropriate factual finding to support its conclusion of a "threat of serious, irreparable, or immediate harm or damage" to life or property.[2] In other words, to comply with APA standards, the DOI and MMS must weigh relevant facts and data and articulate an explanation for their decision to suspend OCS operations that demonstrates a rational connection between the facts found and the choices made. However, the Report on which the Moratorium states it is based does not contain any facts, data, analysis, or risk assessment concerning why Secretary Salazar imposed a Moratorium on further drilling by the "33 permitted wells." To the contrary, 29 of these 33 wells were subjected to additional inspections following the Incident and found compliant with MMS regulations. Ex. 4.

16.    According to the "MMS Deepwater Drilling Inspection Report" issued on May 11, 2010, (Ex. 4), MMS found no violations of governing regulations or existing permit terms on 27 of the 29 drillings rigs inspected and only minor violations on the two others. Further, each of the 33 rigs had previously satisfied the rigors of the MMS permitting process. The Report does not reference this document or the results of the additional inspections; in fact, it references no facts at all. In short, the Moratorium lacks the factual findings required by the APA.

---

[1] The APA waives sovereign immunity of the United States and its federal agencies for challenges to final agency action that seek relief other than monetary damages. 5 U.S.C. §§ 702, 704. It authorizes courts reviewing an agency action to *"hold unlawful and set aside* final agency action, findings, and conclusions to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." (emphasis added). 5 U.S.C. § 706(2)(A). It also permits courts to postpone the effective date of an agency action. 5 U.S.C. § 705. The Moratorium and NTLs, issued pursuant to OCSLA, are subject to review under these provisions for compliance with the APA and with OCSLA and its implementing regulations.

[2] See 5 U.S.C. 551 *et seq.*; 30 CFR. 250.172(b).

### (3)    The DOI's Own Experts Disagree With the Moratorium

17.    But the lack of factual bases and regulatory authority are not the only evidence of the arbitrary and capricious nature of the Moratorium and NTL-4.  It has since come to light that the experts cited in the Report upon which the Moratorium was based do not agree – and never did agree – with the Moratorium or NTL-4.    Ex. 5.    The experts constituted a National Academy of Engineering peer review panel which had been asked by the DOI to share their advice and expertise regarding the Incident.

18.    The "moratorium" version of the Report approved by those experts called for a six-month moratorium on *new drilling permits* for rigs operating in excess of *1,000'* of water, and for "*a temporary pause* in all current drilling operations" to perform additional blowout preventer, well pressure, and well barrier testing. *Id.* (emphasis added).  In other words, the 33 rigs currently drilling were to be checked to make sure they were functional and operating safely, and then be allowed to continue their drilling.  This finding is consistent with the inspection undertaken by the MMS and the further inspections ordered pursuant to a recent Notice, NTL-5. Compare *Id.* to Exhibit 6 and Exhibit 8 (NTL-5).

19.    Due to the misrepresentation of their recommendations, five of the seven experts issued a public letter stating that "**The Primary Recommendation in [NTL-4]…Given by Secretary Salazar to The President Misrepresents our Position.**" Exs. 5 and 7.  The experts' public letter also stated that:

> "**We do not agree with the six month blanket moratorium on floating drilling.**
> ***
> **A moratorium was added after the final review and was never agreed to by the contributors.**
> ***

> The report highlights the safety record of the industry in drilling over 50,000 well on the [OCS] of which 2000 were in over 1000 feet of water and 700 were in greater than 5000 feet of water.
>
> ***
>
> The only other major pollution event from offshore drilling was 41 years ago. This was from a shallow water platform in Santa Barbara Channel drilled with a BOP on the surface of the platform.
>
> ***
>
> The safety of offshore workers is much better than that of the average worker in the U.S., and the amount of oil spilled is significantly less than that of commercial shipping or petroleum tankers.
>
> ***
>
> This tragedy had very specific causes. A blanket moratorium will have the indirect effect of harming thousands of workers and further impact state and local economies suffering from the spill. We would be in effect punishing a large swath of people who were and are acting responsibly and are providing a product the nation demands.
>
> ***
>
> A blanket moratorium does not address the specific causes of this tragedy. We do not believe punishing the innocent is the right thing to do. We encourage the Secretary of the Interior to overcome emotion with logic and to define what he means by a "blanket moratorium" in such a way as to be consistent with the body of the report and the interests of the nation."

Ex. 5 (emphasis added). The Deputy Secretary of the DOI has since issued an apology to those experts. Ex. 6.

20. Far from supporting the Moratorium, the recommendations made by these DOI experts actually undermine the Secretary's justification of the blanket Moratorium. In fact, Benton Baugh, President of Radoil and one of the experts relied upon by the DOI, said that "in at least two separate hour-and-a-half phone calls among Interior and the experts, there was no discussion of a moratorium on existing drilling. Because if anybody had [made that suggestion] we'd have said that 'that's craziness.'" See Ex. 13 (emphasis added).

21. Instead, "the 'bulk' of [the] recommendations [included in the draft moratorium approved by the experts] could be done within 30 days" and "most of the longer-term provisions

would result in only 'marginal increases in safety.'" Ex. 13. In light of these facts, the Moratorium and NTL-4 can only be viewed as an arbitrary and capricious decision unsupported by the regulations upon which it purported to rely.

22.     It was reported that the DOI told Bob Bea, one of the experts who signed the letter, that the Moratorium "was a [White House] request." Ex. 7. But the Report provided to the White House provided no factual support for the blanket Moratorium; therefore, to the extent the Moratorium was based upon a White House request, that request was made without the case-by-case factual basis required under the APA and 30 C.F.R. 250.170 *et seq.*

23.     Finally, while the Moratorium and NTL-4 direct a "six-month suspension," NTL-4 suggests that the suspension could extend beyond six months. NTL-4 states that "MMS will not consider for another six months from the date of this Moratorium NTL drilling permits for deepwater wells and related activities as set forth herein" and, with respect to the 33 currently permitted wells, the operators must "cease operations and temporarily abandon or close the wells until" they receive "further guidance from the Regional Supervisor for Field Operations." Ex. 3 at p. 1.

24.     On June 8, 2010, the DOI and MMS issued NTL-5. *See* Ex. 8. This document demonstrates that the Moratorium and NTL-4 violate the suspension powers granted Defendants by admitting that the alleged cause for the Moratorium, the Deepwater Horizon Incident, "is currently under investigation." *Id.* In other words, Defendants admit they do not know why the Incident occurred. If that finding has not been made, how could Defendants, as they must, "weigh relevant facts and data and articulate an explanation for their decision to suspend OCS operations that demonstrates a rational connection between the facts found and the choices

made"?   *See Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Company*, 463 U.S. 29, 43 (1983).[3]

25.     Further, if the Incident is still under investigation, (and their own experts' recommendations do not support their characterization of the safety of the entire offshore drilling industry), Defendants cannot show a suspension is warranted by a "threat of serious, irreparable, immediate harm or damage" or for "the installation of safety or environmental protection equipment" for any of the 33 currently permitted wells.  Most importantly, NTL-5 – like NTL-4 – provides no justification for the Moratorium's duration.  Simply put, the six-month moratorium period on new permits and immediate suspension of operations on the 33 currently permitted wells was not only plucked out of thin air, but was contrary to the recommendations upon which its panel of experts agreed.

## C.     THE MORATORIUM WILL IRREPARABLY HARM PLAINTIFFS

26.     Because of the ambiguity in the Report's requirements, independent analysts have stated that Defendants' actions will likely result in a moratorium on all deepwater drilling for years.  Ex. 9 (Morgan Stanley Report, June 10, 2010).  And those same analysts have already downgraded the ratings of Plaintiffs' stock as a result, causing Plaintiffs irreparable and incalculable harm.  *Id.*

---

[3] An administrative action will "normally" be considered arbitrary and capricious when "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*; *United States v. Snoring Relief Labs, Inc.*, 210 F.3d 1081, 1085 (9th Cir. 2000).

27.    Plaintiffs have current, existing contracts that the Moratorium and NTL-4 have already impacted.  Since the imposition of the Moratorium and NTL-4, certain customers have instructed Plaintiffs – and other drilling companies – to stop drilling in the GOM.  Some of these customers have publicly indicated that the Moratorium constitutes a Force Majeure event, potentially impacting Plaintiffs' contract rights and creating a risk of further adverse consequences. Ex. 10.  Termination of Plaintiffs' contracts coupled with an uncertain end to the Moratorium will harm Plaintiffs' business in ways that are irreparable, including but not limited to dispersal of rig crews and uncertainty as to when and under what conditions domestic deepwater oil and gas exploration industry will resume.  Re-starting operations with new personnel will only increase the risk to safety.  Further, there is no guarantee that Plaintiffs will ever be able to recover its losses from a direct, financially-solvent, non-immune defendant.

**D.    THE REPORT, NTL-4, AND THE MORATORIUM VIOLATE THE LAW AND ARE ARBITRARY AND CAPRICIOUS**

28.    While Plaintiffs acknowledge Defendants' authority under OCSLA and the regulations promulgated pursuant to it to direct Suspensions of Operations with respect to OCS drilling activities on an individual, rig-specific, case-by-case basis (based on appropriate findings and in compliance with governing procedures), the Moratorium and NTL-4 violate the procedures established by law, exceed the authority granted to Defendants, and are arbitrary, capricious, an abuse of discretion and otherwise contrary to law.

29.    Under the APA, this case will be resolved based on the administrative record before the Secretary when he made the challenged decision. *Camp v. Pitts*, 411 U.S. 138, 142 (1973).  The administrative record in this case consists of the Moratorium, NTL-4 and the Record that the Secretary submitted to the President. Exs. 1, 2, and 3. *That is the entire*

*administrative record.*   NTL-5 is not part of the administrative record and should not be considered in support of either the Moratorium or NTL-4.

30.    However, while NTL-5 cannot provide support for the blanket Moratorium on new permits, it does provide a way forward for the issuance of future deepwater drilling permits. To that extent, NTL-5 is consistent with Defendants' experts' finding and recommendations and provides a reasonable alternative to the blanket Moratorium, allowing Defendants to abrogate the blanket suspension in favor of determining its suspension on future permits on a case-by-case basis as the required safety enhancements are completed and verified.  Ex. 8.

31.    In summary, issuance of the Moratorium and NTL-4 exceeded the authority granted to Defendants under OSCLA to direct suspensions of OCS operations.  Despite an administrative record that contains no facts, data, or analysis whatsoever to satisfy the statutory or regulatory standards for such a suspension, Defendants ordered an industry-wide six-month cessation of all OCS drilling beyond water depths of 500 feet, effectively shutting down all OCS activity in deeper than 500 feet of water.  The Moratorium and NTL-4 are arbitrary and capricious, an abuse of discretion and otherwise not in accordance with the law in at least the following ways:

(a)    OCSLA requires that Defendant balance orderly resource development with protection of the human, marine and coastal environments.  43 U.S.C. § 1332(3). According to the Report, "[o]ffshore operations provide direct employment estimated at 150,000 jobs." Report, Ex. 1, at p. 4.  These workers represent an industry that depends upon robust OCS drilling activities.  The loss of jobs in the industry will drive away the labor force required by companies such as Diamond Offshore to ensure continued safe and orderly resource development

on the OCS. The Moratorium and NTL-4 place these jobs at risk without weighing any of the impact that the loss of an experienced and available workforce will have on future OCS resource development. Defendants risk the loss of countless invaluable employees that are depended upon by all companies working on the OCS without analysis or any rational connection between the (still unknown) facts surrounding the Incident and the choice made to risk the loss of this workforce by issuing the Moratorium and NTL-4.

(b)     Defendants must set the length of any suspension based on the conditions of the individual case involved. 30 C.F.R. 250.170(a). Without any finding of threat of serious, irreparable, immediate harm or damage with respect to any OCS deepwater drilling other than the Incident, a clean bill of health on 27 of the 29 rigs inspected post-Incident, AND a finding of only "minor problems" on the other two, the Moratorium and NTL-4 not only prohibit the consideration of any new applications for permits to drill, but also require the cessation of all drilling at the 33 permitted wells. The Moratorium and NTL-4 are therefore overly broad, not based on any rational factual inquiry, and issued in violation of 30 C.F.R. 250.170. And, there is no evidence to the contrary.

(c)     The MMS issued NTL-4 to halt all drilling in beyond 500 feet (except by the same companies responsible for the Incident) despite the lack of any evidence showing any specific circumstances of noncompliance by Plaintiffs with MMS safety standards for deepwater drilling or with any other relevant safety and environmental regulations either before or after the Incident.

13

(d)     Although the Report states -- without any factual support, relevant data or analysis -- that "risks associated with operating in water depths in excess of *1,000 feet* of water are significantly more complex than in shallow water," NTL-4 arbitrarily halts all drilling activities at water depths "greater than *500 feet.*" (emphasis added).  The line Defendants drew between 500 feet and 1,000 feet of drilling is not supported by the experts' recommendations upon which the Report was purportedly based.

(e)     Finally, although the Moratorium and NTL-4 claim they are based on the "recommendations in the Report," the Report, with the exception of its general and conclusory recommendation of "a six-month moratorium on permits for new wells being drilled using floating rigs," provides no factual findings, data, or analysis to support issuance of the Moratorium under the governing statutory and regulatory standards.  Indeed, the Report justified its Recommendations on another basis altogether – that the changes in policies, practices, and procedures it recommends are those "which the Department identified as important for workplace and environment safety *even before completion of the investigation into the event.*"  Report at p. 18 (emphasis added).[4]  That is not the legal standard that applies.

## E.     THE MORATORIUM VIOLATES PLAINTIFFS' CONSTITUTIONAL RIGHTS

32.     By virtue of their actions, Defendants have violated Plaintiffs' rights under the Fifth Amendment to the U.S. Constitution.  That amendment provides that no person shall suffer

---

[4] A finding of "importance" does not satisfy the heightened statutory or regulatory standards for an immediate suspension of drilling established by 43 U.S.C. § 1334(a)(1) and 30 C.F.R. § 250.172.

a "taking" of private property without due process of law or just compensation.  As set forth above, the actions of Defendants herein constitute a taking of Plaintiffs' contract rights without due process of law for which Plaintiffs seek non-monetary relief.

## APPLICATION FOR TEMPORARY RESTRAINING ORDER

33.    If Defendants are not immediately restrained from enforcing the Moratorium and NTL-4, Plaintiffs will continue to suffer imminent and irreparable injury for which there is no adequate remedy at law. Simply put, the damage that can be reasonably expected as a result of the Moratorium is on a scale never before seen in the Gulf Coast oil and gas industry.  Rig crews will disperse and may never be re-comprised.  Tens, if not hundreds of thousands of individuals could lose their jobs.  Countless companies providing support to Plaintiffs and other deepwater drillers are at risk of going under (e.g. caterers, transporters, anchor-handling crews, tug crews, remote-operated vehicle crews, etc.). Thus, the impact of the Moratorium will be felt not only by Plaintiffs, but by other drillers, exploration and production companies, and, indeed, the entire Gulf Coast economy, as the effect of a six-month moratorium could easily mean the loss of all deepwater drilling in the Gulf for years to come, as drilling contractors would likely seek to employ their rigs elsewhere rather than have their rigs sit dormant waiting for the Moratorium to be lifted.  Exs. 11 and 12 (letters to President Barack Obama from Louisiana Governor Bobby Jindal and Louisiana Senator Mary L. Landrieu, June 2, 2010 and June 11, 2010, *respectively*, requesting immediate relief from the "blanket" moratorium on deepwater drilling). A monetary award to Plaintiffs won't bring those jobs back to the Gulf Coast or those offshore support companies back to life, and the potential damage done to the Gulf Coast as a result is beyond measure.  Further, the issue of who is responsible for the monetary losses suffered appears to be an open question.

34.     There is a substantial likelihood that Plaintiffs will prevail on the merits. As noted above at great length, the nature of Defendants' actions were arbitrary, capricious, an abuse of discretion, and a result of 'emotion triumphing over logic,' according to Defendants' own experts.

35.     The threatened harm to Plaintiffs outweighs the harm that a temporary restraining order would inflict on Defendants. Plaintiffs have a superior drilling record, having safely drilled more than 650 wells from floating rigs in the last ten years in the GOM without ever experiencing a significant well-control problem.  To punish Plaintiffs – and, indeed, all the other deepwater drillers and support personnel that have maintained longstanding records of safe deepwater operations — particularly in such an arbitrary manner, significantly outweighs any harm to Defendants.

36.     Issuance of a temporary restraining order would not adversely affect the public interest or public policy.  Quite the opposite.  The tens of thousands of Gulf Coast citizens who have and/or will find themselves out of work as a result of Defendants' Moratorium would benefit significantly from the lifting of this arbitrary and capricious drilling ban.

37.     Plaintiffs are willing to post a bond in the amount the court deems appropriate.

38.     Plaintiffs ask the Court to issue a temporary restraining order preventing Defendants from enforcing the Moratorium imposed by NTL-4 as applied to all drilling in water at depths of greater than 500 feet, and asks the Court to set Plaintiffs' request for a preliminary injunction for a hearing at the earliest possible time.

## REQUEST FOR INJUNCTIVE AND DECLARATORY RELIEF

39.     Plaintiffs apply for and move this Court under Rule 65 of the Federal Rules of Civil Procedure to issue a Preliminary Injunction and thereafter a Permanent Injunction enjoining

the Moratorium and NTL-4 as applied to all drilling activities for any wells in depths of water greater than 500 feet. Plaintiffs seek a temporary and permanent injunction against Defendants' continued violations of Plaintiffs' constitutional rights.

40. If maintained, the Moratorium and NTL would result in intentional and unwarranted interference with Plaintiffs' existing contracts with operators of currently-permitted wells and its prospective contractual relations with other exploration and production companies, all in violation of the Maritime law of the United States. Therefore, Plaintiffs request a declaratory judgment that the Moratorium and NTL-4 are invalid and unenforceable pursuant to 28 U.S.C. § 2201 et seq. and FRCP 57.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court order the following relief preliminarily, and after a full trial on the merits, permanently:

1. Declare both the Moratorium and NTL-4 invalid and unenforceable;

2. Declare that Defendants have violated and continue to violate OCSLA and its implementing regulations, and, accordingly, that Defendants have violated the APA;

3. Immediately, temporarily and permanently enjoin and restrain Defendants from enforcing the Moratorium and NTL-4 as applied to all drilling in water at depths of greater than 500 feet, and;

4. Grant Plaintiffs such further relief as the Court deems just, proper, and equitable.

Respectfully submitted,

By: _____

Paul J. Dobrowski

Federal Bar No. 3208

### ATTORNEY-IN-CHARGE FOR PLAINTIFFS

OF COUNSEL:

Anthony D. Weiner
Federal Bar No. 38618
Dobrowski L.L.P.
4601 Washington Avenue, Suite 300
Houston, Texas 77007
713-659-2900
713-659-2908 (fax)

William C. Long
Federal Bar No. 22854
Laura P. Haley
Federal Bar No. 26311
15415 Katy Freeway, Suite 100
Houston, Texas 77094
281-647-2180
281-647-2223 (fax)
ATTORNEYS FOR DIAMOND OFFSHORE

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

United States District Court
Southern District of Texas
FILED

JUN 1 7 2010

David J. Bradley, Clerk of Court

DIAMOND OFFSHORE COMPANY, §
DIAMOND OFFSHORE MANAGEMENT §
COMPANY, §
     *Plaintiffs,* §
§
v. §
§
KENNETH LEE "KEN" SALAZAR, IN HIS §
OFFICIAL CAPACITY AS SECRETARY, §
UNITED STATES DEPARTMENT OF THE §
INTERIOR; UNITED STATES §
DEPARTMENT OF THE INTERIOR; §
ROBERT "BOB" ABBEY, IN HIS OFFICIAL §
CAPACITY AS ACTING DIRECTOR, §
MINERALS MANAGEMENT SERVICE; §
AND MINERALS MANAGEMENT SERVICE, §
     *Defendants.* §

**10-2136**

Civil Action No. _____

## VERIFICATION

I, Lawrence R. Dickerson, am Chief Executive Officer of Diamond Offshore Company and Diamond Offshore Management Company.

I have read and reviewed the factual allegations set forth in the attached *PLAINTIFFS' ORIGINAL COMPLAINT AND APPLICATION FOR TEMPORARY RESTRAINING ORDER AND INJUNCTIVE RELIEF.*

I have personal knowledge of these factual allegations, and they all are true and correct to the best of my knowledge, information, and belief.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

_____
Lawrence R Dickerson

SUBSCRIBED and SWORN TO BEFORE ME on 17th day of ___June___, 2010.

_____
Notary Public in and for the State of Texas
My commission expires: ___4-27-2013___

DEBRA D. FAST
Notary Public, State of Texas
My Commission Expires
April 27, 2013